IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 19, 2021

**STATE OF TENNESSEE v. MICHAEL LEON CAUDLE**

**Appeal from the Circuit Court for Montgomery County**
**No. CC-2014-CR-1071      William R. Goodman, III, Judge**

———————————

**No. M2020-01365-CCA-R3-CD**

———————————

The Defendant, Michael Leon Caudle, was convicted of two counts each of selling less than 0.5 gram of cocaine within a drug-free school zone and delivering less than 0.5 gram of cocaine within a drug-free school zone, and one count of possessing 0.5 gram or more of cocaine within a drug-free school zone with the intent to sell, deliver, or manufacture. The trial court merged the two delivery convictions with the corresponding sale convictions and imposed an effective sentence of sixty years' incarceration. In this delayed appeal,[1] the Defendant challenges the sufficiency of the evidence. Following our review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Gregory D. Smith (in first appeal, post-conviction petition, and present appeal) and Cleveland C. Turner (at trial), Clarksville, Tennessee, for the appellant, Michael Leon Caudle.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and C. Daniel Brollier, Assistant District Attorney General, for the appellee, State of Tennessee.

———————————

[1]After the Defendant's trial, an error described by the trial court as an "oversight" on trial counsel's part resulted in a failure to file a motion for new trial and timely notice of appeal. After the trial court attempted to remedy the situation by entering an agreed order granting a delayed appeal, this court remanded the case with instructions for the Defendant to request a delayed appeal by a post-conviction petition. The Defendant filed a post-conviction petition, which the trial court granted. This is the Defendant's first appeal on the merits of his case. A detailed procedural history of this case may be found in this court's opinion regarding the first delayed appeal, State v. Michael L. Caudle, No. M2018-01471-CCA-R3-CD, 2019 WL 5883678, at *1-2 (Tenn. Crim. App. Nov. 12, 2019).

# OPINION

## FACTUAL BACKGROUND

This case relates to a controlled drug purchase conducted by the Clarksville Police Department ("CPD") on December 20, 2013, and a subsequent unplanned drug sale nearby. The Defendant was charged with alternate counts of selling and delivering less than 0.5 gram of cocaine within a drug-free school zone in each incident (Counts[2] 3, 4, 5, and 6), Class B felonies; possession of 0.5 gram or more of cocaine within a drug-free school zone with the intent to manufacture, sell, or deliver, (indictment Count 7), a Class A felony; and resisting arrest (indictment Count 8), a Class B misdemeanor. See Tenn. Code Ann. §§ 39-16-602, -17-408, -17-417. The Defendant proceeded to a jury trial.

At trial, CPD Patrol Sergeant Griffie Briggs testified that he was a narcotics agent with the department's "Special Operations Unit." He was the "case agent" assigned to a December 20, 2013 controlled drug buy involving a confidential informant ("CI"), James Nelson,[3] whose nickname was "Bugs Bunny." Sergeant Briggs stated that Mr. Nelson was paid $160 for his cooperation in the December 20 buy.

Sergeant Briggs testified that generally, officers searched CIs and the vehicles they used to travel to and from a drug buy for drugs, weapons, and money. The CIs wore an audio device, which recorded the transaction and broadcasted it to officers in real time. The CIs contacted suspected drug sellers and once a location was arranged, the officers would surveille the CIs as they traveled to the location. After the sale, the CIs met the officers at a predetermined location and surrendered any narcotics. Officers searched the CIs and their vehicles again; afterward, the officers composed written statements.

Sergeant Briggs testified that he followed standard procedure with Mr. Nelson during the December 20 buy, including searching Mr. Nelson before he left Sergeant Briggs's office. Around 1:11 p.m., Mr. Nelson called a telephone number ending in 1685, but the person did not answer. About three minutes later, the same telephone number returned Mr. Nelson's call. Sergeant Briggs affirmed that he gave Mr. Nelson cash to use in the controlled drug buy, and he identified a photocopy of the cash. He noted that the photocopy documented the bills' serial numbers.

---

[2] The indictment also charged the Defendant in Counts 1 and 2 with alternate counts of selling and delivering more than 0.5 gram of cocaine within a drug-free school zone on December 17, 2013. The State severed these counts of the indictment and eventually dismissed them. The remaining counts were renumbered for the jury at trial.

[3] Mr. Nelson was deceased at the time of the Defendant's trial.

Sergeant Briggs testified that his vehicle "kept primary surveillance on" Mr. Nelson and contained equipment that received Mr. Nelson's audio transmission. Other police cars traveled in front of and behind Mr. Nelson's car, and they all drove to a Hastings store parking lot. Sergeant Briggs identified an aerial photograph of the area and noted that New Providence Middle School was nearby. He stated that Mr. Nelson was under constant audio and visual surveillance during the drug buy and that Mr. Nelson never exited his car prior to the drug buy. Sergeant Briggs identified a series of photographs, which depicted Mr. Nelson in his car in the Hastings parking lot; a second, white car parked near Mr. Nelson's car; Mr. Nelson exiting his car while speaking to the driver of the white car, whose driver's side door was ajar; Mr. Nelson entering the front passenger seat of the white car; the white car's license plate; and Mr. Nelson exiting the white car.

Sergeant Briggs testified that the Defendant was the white car's driver and that the officers could not see what occurred in the white car. He said, though, that Mr. Nelson's audio device recorded a general conversation between the men about women and friends. Sergeant Briggs acknowledged that the men did not discuss a transaction; he did not recall whether they talked about a person's owing someone else money. Sergeant Briggs stated that according to his notes, Mr. Nelson was inside the white car for about two minutes. After Mr. Nelson reentered his car and left the parking lot, the officers followed him to the prearranged meeting location. Sergeant Briggs affirmed that he never lost sight of Mr. Nelson. Mr. Nelson gave Sergeant Briggs a substance that field tested positive for cocaine.

On cross-examination, Sergeant Briggs testified that he had used Mr. Nelson as a CI in one other controlled drug buy prior to the one involving the Defendant; he noted that Mr. Nelson was a CI for other officers in his department. Sergeant Briggs did not recall whether Mr. Nelson was paid for the previous drug buy or cooperated with police in exchange for a favorable agreement with the State related to pending criminal charges. Sergeant Briggs stated that if Mr. Nelson had not successfully bought drugs during the controlled buy, Sergeant Briggs's supervisor would have determined whether Mr. Nelson would still be paid.

Sergeant Briggs testified that Mr. Nelson brought up the Defendant as someone engaged in criminal activity during a meeting with the officers. Sergeant Briggs stated that they chose to pursue the Defendant for no particular reason, and he noted that the Defendant was one of the first people Mr. Nelson discussed that day.

Sergeant Briggs testified that another officer searched Mr. Nelson before the controlled buy; Sergeant Briggs did not know how the other officer searched Mr. Nelson, although he denied that Mr. Nelson was strip-searched. Sergeant Briggs stated that he searched Mr. Nelson's pockets, shoes, and car after the buy. Sergeant Briggs said that Mr. Nelson drove his own car during the controlled buy and that Sergeant Briggs searched the car "until [he] was comfortable" that the car contained no contraband, weapons, or cash.

When asked whether Mr. Nelson "dealt dope," Sergeant Briggs testified that to his knowledge, Mr. Nelson only used drugs and that he did not know if Mr. Nelson ever sold drugs. Other officers "wired" Mr. Nelson's person and his car. Sergeant Briggs denied that he and Mr. Nelson were ever separated in traffic while traveling to and from the controlled buy. Sergeant Briggs stated that if Mr. Nelson possessed drugs before the controlled buy, the officers would not have allowed it to proceed. He acknowledged, though, that it was possible for people to conceal drugs in their anal cavities and hide drugs "very, very well" to avoid detection. He agreed that he did not know how Mr. Nelson was searched before the drug buy because he did not participate in the search.

The recordings related to the controlled drug buy were entered as exhibits. The first recording consisted of Sergeant Briggs's stating the date and that CI Bugs Bunny was calling "M.C." During the call on speakerphone, the recipient asked who was calling, and Mr. Nelson identified himself as "M.J." The recipient stated that he would call M.J. back and hung up. The second recording contained Sergeant Brigg's recitation of the date and that they anticipated a drug sale for $100 worth of crack cocaine from "M.C." at Hastings. The final recording documented Mr. Nelson's driving to Hastings; after about thirty-five minutes, the recording reflected Mr. Nelson's entering an area in which loud music was playing. Mr. Nelson discussed women and social conflicts with a second man; the conversation was unclear due to the background music.

CPD narcotics officer Robert Del Giorno testified that he searched Mr. Nelson's car and "wired" it. Officer Del Giorno witnessed Mr. Nelson and the Defendant's encounter in the Hastings parking lot, although he did not listen to the audio transmission in real time. He confirmed that Mr. Nelson was in the Defendant's car for a couple of minutes. When the Defendant drove away from the parking lot, Officer Del Giorno watched him drive down the street to a nearby Kwik Stop tobacco store. Officer Del Giorno photographed the Defendant's car as it left Hastings and when it parked at the tobacco store. When asked whether he was assigned to monitor the Defendant's car after the controlled buy, Officer Del Giorno responded negatively and noted that "for whatever reason, [he] just took interest in" the Defendant's car.

Officer Del Giorno testified that he saw a woman he recognized, who was later identified as Ann Marie Mastele, exit a car and enter the passenger side of the Defendant's white car; he noted that Ms. Mastele was a drug user who had previously worked as a CI for the police department. He stated that in his experience, Ms. Mastele was a reliable CI. Officer Del Giorno notified other officers in the area, but he was not involved in the subsequent arrest.

On cross-examination, Officer Del Giorno testified that he searched the passenger compartment, glove compartment, and trunk of Mr. Nelson's car. He acknowledged, though, that he did not "feel under the dash." Officer Del Giorno did not find any hidden

compartments around the car's windshield, and he did not recall the car's having floor mats. He was not present when Mr. Nelson was searched before the buy. Officer Del Giorno did not note in his report whether the car had other containers inside it; he stated that if he had found contraband or money, he would have taken note of it. He did not photograph Mr. Nelson's car.

Officer Del Giorno testified that he had conducted "numerous" controlled drug buys with Ms. Mastele, whose nickname was "Easy Bake." Although Officer Del Giorno did not know Ms. Mastele's criminal record and was unaware that she had active arrest warrants, he knew that she was incarcerated at the time of trial. Ms. Mastele was paid between $100 and $150 for some drug buys, and she participated in others in exchange for consideration by the State.

CPD Officer Jason Hankins testified that he and CPD Agent Will Evans served as "security" for the controlled drug buy to protect Mr. Nelson and that they were parked such that Officer Hankins did not see Mr. Nelson meet the Defendant. After the controlled buy, Officer Del Giorno advised him of the situation at the tobacco store involving Ms. Mastele, whom Officer Hankins also knew. Agent Evans pulled up behind the Defendant's car, and Officer Hankins approached Ms. Mastele and asked, "[W]hat did you get, Ann?" He stated that Ms. Mastele looked at him "in disappointment" and answered that she "got some dope." Upon request, Ms. Mastele set what appeared to be two unpackaged rocks of crack cocaine on the back of the Defendant's car.

Officer Hankins testified that he heard Agent Evans order the Defendant out of the car and "some commotion." Officer Hankins elaborated that the Defendant was reaching under the driver's seat, that the Defendant was not wearing a seatbelt and could not have been trying to unclasp it, and that Agent Evans told the Defendant to show his hands. Officer Hankins stated that Agent Evans began to pull the Defendant out of the car and that the Defendant turned away from Officer Hankins and continued to reach into the car. Officer Hankins shocked the Defendant with his Taser because he did not know whether the Defendant had a weapon and in his opinion, the Defendant was resisting arrest because he was using physical force to keep Agent Evans from pulling him out of the car.

Officer Hankins testified that the Defendant asked why Officer Hankins shocked him, and Officer Hankins responded that the Defendant was reaching for something. The Defendant stated that he was "just trying to hide the bag," that he "was a petty," and that he was "just trying to make some Christmas money." Officer Hankins stated that Agent Evans searched Ms. Mastele's purse and found a "straight shooter" cocaine pipe.

Ms. Mastele testified that she had pending charges for identity theft, forgery, possession of unlawful drug paraphernalia, and an unspecified charge related to methamphetamine. She stated that she was arrested the Friday before the Defendant's trial

and that she had never spoken to the prosecutor before. She said that on December 20, 2013, she met the Defendant in the tobacco store parking lot to buy two or three rocks of crack cocaine, for which she paid sixteen dollars. Ms. Mastele called the Defendant on his cell phone a few minutes before they met and told the Defendant that she wanted to buy cocaine. When the Defendant arrived, she entered the Defendant's car for between five and ten minutes. As Ms. Mastele exited the Defendant's car, Agent Evans and other officers pulled up behind the car.

Ms. Mastele testified that she gave verbal and written statements; in the verbal statement, she told officers that she met with the Defendant while she was on her way to "WIC" and that she was "in a hurry." In the written statement, she admitted to "buying from" the Defendant. The officers confiscated her cocaine and pulled her away from the car because the Defendant was "resisting." She stated that although she worked for CPD as a CI, officers had not asked her to buy cocaine from the Defendant on this occasion. Ms. Mastele was charged with drug possession and placed on probation based upon the December 20 incident. She affirmed that no promises had been made to her in exchange for her testimony.

On cross-examination, Ms. Mastele testified that she had no previous perjury charges, and she explained that her pending charges resulted from her attempting to obtain identification in another person's name. She stated that she was a drug addict in December 2013, but that she had been "clean" for almost one year at the time of trial.

Ms. Mastele testified that on the day of the incident, she called the Defendant and was upset because a man nicknamed "Boney" cursed at her over the phone and called her names. She denied that she was angry with Boney for selling her drugs and taking her money. Ms. Mastele stated that the Defendant came "almost immediately" after her call and that the Defendant told her where to meet him.

Ms. Mastele testified that the officers told the Defendant to exit the car, that he would not, that the officers said they would have to use force, and that she heard the Defendant scream about being shocked with a Taser. She denied that one of the officers told another officer to shoot the Defendant. Ms. Mastele stated that she had worked as a CI between fifteen and twenty times, or maybe more. She sometimes received between $100 and $150 in exchange for the CI work, and other times she received reduced criminal charges. She denied that she was arrested to ensure she testified at the Defendant's trial and that anyone offered her help in exchange for her testimony.

CPD Drug Agent Will Evans testified that he worked with Officer Hankins as security for the December 20, 2013 controlled drug buy. He stated that Officer Del Giorno advised them that the Defendant parked at the tobacco store and that Ms. Mastele got into the Defendant's car. Agent Evans drove to the parking lot and talked to the Defendant

through a cracked window. The Defendant leaned forward and made "furtive movements" under the driver's seat and near the driver's side door. Agent Evans testified consistently with Officer Hankins about extracting the Defendant from the car; the Defendant complained of back pain, and Officer Hankins called an ambulance. Agent Evans searched the Defendant while he was on the ground handcuffed and found $188 in cash.

Agent Evans testified that crack cocaine sold for about $100 per gram, meaning that the 4.1 grams of cocaine found in the Defendant's car was worth about $400. Agent Evans identified photographs of the cash he found on the Defendant's person and photographs of the cash compared to the photocopies of the controlled drug buy money the CPD provided Mr. Nelson. The photographs reflected that the serial numbers of five twenty-dollar bills matched the photocopies. Agent Evans recovered cocaine and an oxycodone pill from Ms. Mastele. After the Defendant was discharged from the hospital, he waived his rights and spoke to Agent Evans at the police station.

An edited copy of the Defendant's police interview was played for the jury and reflected various statements the Defendant made.[4] In the first statement, the Defendant said that he was "just trying to get . . . some Christmas money." In the second statement, the Defendant stated that he knew Ms. Mastele because his uncle "messed with" her. When asked if the Defendant sold Ms. Mastele "dope" that day, he responded that he was "trying to help [him]self." When asked how often he sold drugs, the Defendant replied, "Well, I just thought because it's Christmas time," and he noted that he sometimes cut hair to make money and previously worked for a roofing and construction company. The Defendant also noted that he "tweaked" his back and that this was why he did not exit the car quickly enough for the officers. The Defendant admitted that when he moved around the car, he had drugs in his hand. He denied "cooking" crack cocaine and stated that he bought an "8 ball" the day before. He estimated that he had about three grams left. When asked how much cocaine he sold per week, the Defendant stated, "No, this just now happened right here." The Defendant said that the dealer from whom he bought cocaine would not tell the Defendant his name. The Defendant offered to "help [the police] get him" and noted that everyone knew the Defendant. Agent Evans identified a photograph of the Defendant's cell phone call log, which reflected an incoming call at 1:14 p.m. and a 1:53 p.m. incoming call from a contact labeled "Anna."

On cross-examination, Agent Evans testified that he was Ms. Mastele's "handler" and that he had conducted thirty-five controlled drug buys with her over a span of nine years. He affirmed that she was not working for the police on December 20, 2013. Agent Evans identified Boney as Kevin Gilmore, another drug dealer who had been arrested previously for selling cocaine and drug possession. Agent Evans stated that Ms. Mastele

---

[4] An unedited version of the recording, which was hours long and included long periods of time in which the Defendant was alone in the interview room, was included in the appellate record.

tried to buy cocaine from Mr. Gilmore on December 20 and that he insulted her. Agent Evans agreed that Ms. Mastele was a drug user and that he believed that she was there to buy cocaine from the Defendant. The cocaine in Ms. Mastele's possession tested positive for 1.6 grams of cocaine base, which would cost between $14 and $16.

Tennessee Bureau of Investigation Special Agents Ella Carpenter, Lela Jackson, and Cassandra Ann Franklin-Beavers, experts in forensic chemistry, testified that they tested the substance collected in the Defendant's car, the substance Mr. Nelson provided the police after the controlled buy, and the substance collected from Ms. Mastele, which were 4.7 grams of cocaine base, 2.35 grams of cocaine base, and 0.16 gram cocaine base, respectively.

CPD Crash Investigator Bill VanBeber III testified that he used a radar device to measure the distance between New Providence Middle School and the Hastings parking lot, which was 750 feet. He also measured between the middle school and two locations in front of the tobacco store, which were respectively 438 feet and 480 feet.

Upon this evidence, the jury acquitted the Defendant of resisting arrest and convicted him as charged in the remaining counts. After a sentencing hearing, the trial court found that the Defendant was a career offender, merged the respective sale and delivery counts, ordered concurrent service of the sentences, and imposed an effective sixty-year sentence. After the above-referenced procedural issues and being granted post-conviction relief, the Defendant filed a delayed motion for new trial, which was denied, and timely filed this appeal.

## ANALYSIS

The Defendant challenges the sufficiency of the evidence supporting the offenses related to the cocaine transactions, arguing relative to the transaction with Mr. Nelson that the evidence does not establish that a cocaine transaction actually occurred. The Defendant contends that the police did not thoroughly search Mr. Nelson and his car, theorizing that that Mr. Nelson could have secreted the cocaine on his person and framed the Defendant. Relative to the transaction with Ms. Mastele, the Defendant argues that the evidence established merely a casual exchange as opposed to a sale or delivery.[5] He does not contest

---

[5] The Defendant does not contest the sufficiency of the evidence related to his conviction for possession of 0.5 gram or more of cocaine in a drug-free school zone with the intent to sell, manufacture, or deliver.

that the sales occurred within a drug-free school zone. The State responds that the evidence was sufficient to support the convictions.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The Defendant was convicted of the sale and delivery of cocaine in violation of Tennessee Code Annotated section 39-17-417(b)(4), which makes it a crime to knowingly sell or deliver a controlled substance. "[A] person . . . acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-302(b). Cocaine is a Schedule II controlled substance. Tenn. Code Ann. § 39-17-406(c)(11). A violation of Tennessee Code Annotated section 39-17-417(a)(2) or (3) involving less than 0.5 gram of cocaine is a Class C felony. Tenn. Code Ann. § 39-17-417(c)(1). An enhanced criminal penalty is imposed if the drug transaction occurs within 1000 feet of a drug-free school zone. See Tenn. Code Ann. § 39-17-432(b)(1). Specifically, if a violation of Tennessee Code Annotated section 39-17-417 occurs "on the grounds or facilities of any school or within one thousand feet (1000') of the real property that comprises a public or private elementary school, middle school, [or] secondary school, . . . [the offender] shall be

punished one classification higher than is provided[.]" Tenn. Code Ann. § 39-17-432(b)(1).

Relative to the transaction involving Mr. Nelson, in the light most favorable to the State, the record reflects that Mr. Nelson named the Defendant to the CPD as a person who was selling crack cocaine. After Mr. Nelson called the Defendant's cell phone, they arranged to meet at the Hastings parking lot. The CPD searched Mr. Nelson and his car in compliance with established protocol and gave him $100 in cash with which to make the drug purchase. The officers made photocopies of the bills to document their serial numbers. The CPD monitored Mr. Nelson as he drove to the appointed location, exited his car, entered the Defendant's car, reentered his own car, and drove to a rendezvous point to surrender the purchased cocaine. When the Defendant was arrested a short time later, the serial numbers of several $20 bills found on his person matched those given to Mr. Nelson.

We note that the Defendant references a handwritten note purportedly composed by the late Mr. Nelson, in which he confessed that the Defendant sold him no drugs that day. The note was witnessed by a woman named Misty Peak, who testified in an offer of proof during trial that Mr. Nelson asked her to witness the letter and deliver it to the Defendant's family in an effort to make amends for having wronged the Defendant. The trial court excluded the note, finding that it was inadmissible hearsay. The Defendant notes in his brief that any issue related to the admissibility of the note "would be an issue for post-conviction, not direct appeal[.]" Because the note was not admitted or considered by the jury in rendering its verdict, it is irrelevant to our analysis of the sufficiency of the evidence.

The Defendant's argument about the thoroughness of Mr. Nelson's pre-buy search relates to the weight of the evidence, not its sufficiency. The jury heard testimony from Sergeant Briggs about the department's procedures with CIs, and defense counsel thoroughly cross-examined the police officers about how Mr. Nelson and his car were searched and monitored before the controlled drug buy. By its verdict, the jury credited the police testimony that they ensured Mr. Nelson had no drugs, weapons, or cash with him. Further, the Defendant told the police in his interview that he was trying to earn Christmas money by selling cocaine. The cash seized from the Defendant's person included bills containing the same serial numbers as the ones Mr. Nelson received from the police for the controlled buy. In addition, the Defendant had a larger bag of cocaine in his car just after the sale to Mr. Nelson. The evidence is sufficient for a reasonable jury to have found that the Defendant sold or delivered crack cocaine to Mr. Nelson, and he is not entitled to relief on this basis.

Relative to the transaction involving Ms. Mastele, in the light most favorable to the State, the record reflects that after selling Mr. Nelson cocaine, the Defendant drove to a nearby tobacco store, where Ms. Mastele got into his car. Ms. Mastele testified that she called the Defendant a few minutes prior to their meeting and asked if she could buy crack

cocaine from him. The testimony established that Ms. Mastele was upset during the call because she tried to buy cocaine from another dealer, who was rude to her. The Defendant told Ms. Mastele to meet him at the tobacco shop, where she paid sixteen dollars for two or three rocks of crack cocaine. As Ms. Mastele exited the Defendant's car, Agent Evans and Officer Hankins confronted her, and she admitted to having bought drugs from the Defendant. After the Defendant was removed from his car, officers found a bag containing 4.7 grams of crack cocaine underneath the driver's seat. In his police interview, the Defendant described his activities that day as trying to earn money for Christmas.

The offense of casual exchange is defined by Tennessee Code Annotated Section 39-17-418(a), which provides: "It is an offense for a person to knowingly possess or casually exchange a controlled substance" without a valid prescription. Additionally, the inference of casual exchange is located in the second sentence of Tennessee Code Annotated section 39-17-419:

> It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing. It may be inferred from circumstances indicating a casual exchange among individuals of a small amount of a controlled substance or substances that the controlled substance or substances so exchanged were possessed not with the purpose of selling or otherwise dispensing in violation of the provisions of § 39-17-417(a). The inferences shall be transmitted to the jury by the trial judge's charge, and the jury will consider the inferences along with the nature of the substance possessed when affixing the penalty.

An exchange means "to part with, give or transfer consideration of something received as an equivalent," and the term casual means "without design." State v. Helton, 507 S.W.2d 117, 120 (Tenn. 1974). This court has concluded that the offense of casual exchange "contemplates a spontaneous passing of a small amount of drugs, for instance, at a party. Money may or may not be involved." State v. Copeland, 983 S.W.2d 703, 708 (Tenn. Crim. App. 1998). A transaction will not be deemed a casual exchange if there was a design or previous plan to make the exchange. State v. Carey, 914 S.W.2d 93, 96 (Tenn. Crim. App. 1995); Loveday v. State, 546 S.W.2d 822, 826 (Tenn. Crim. App. 1976).

Whether a transfer is a casual exchange is to be determined from all facts and circumstances of the case. Helton, 507 S.W.2d at 121.

> Facts and circumstances indicating that the transaction is not a casual exchange include a lack of evidence that the defendant gave the drugs to the buyer out of friendship or as a friendly gesture, no evidence reflecting

anything other than a pecuniary motive for the transfer of the drugs, no prior relationship between the defendant and the buyer, and no reason for the defendant and the buyer to be together, other than for the buyer to purchase drugs.

State v. Bernard Miguel Wallace, No. W2004-02124-CCA-R3-CD, 2006 WL 16315, at *4 (Tenn. Crim. App. Jan. 3, 2006) (internal citations omitted) (quoting State v. Donald L. Haynes, No. E2000-00672-CCA-R3-CD, 2001 WL 416729, at *4 (Tenn. Crim. App. Apr. 24, 2001)).

The record contains no evidence that the Defendant was giving the drugs to Ms. Mastele out of friendship or as a friendly gesture; to the contrary, the evidence shows that the Ms. Mastele contacted the Defendant specifically to arrange a cocaine sale. Although Ms. Mastele confirmed that she was upset, she did not characterize the call as one between friends in which she sought consolation about the incident of rudeness. Likewise, during the Defendant's police interview, he stated only that he was familiar with Ms. Mastele because his uncle "messed with" her, and he never asserted that he gave or sold her the cocaine in response to her emotional state. The Defendant arranged the meeting place for the sale, which was close in time and proximity to his other sale to Mr. Nelson. The Defendant's argument about casual exchange is contradicted by his own statement that he was selling cocaine to earn money for Christmas. The evidence was sufficient for the jury to conclude that the Defendant intended the encounter with Ms. Mastele to be a business transaction rather than a casual exchange. He is not entitled to relief on this basis.

CONCLUSION

In light of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE

-12-